# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-07-00050-CR

---

**Javier A. Gomez, Appellant**

**v.**

**The State of Texas, Appellee**

**&**

---

### NO. 03-07-00051-CR

---

**Niles Emery Woodin, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 2 OF COMAL COUNTY**
**NOS. 2005CR1531 & 2005CR1530**
**HONORABLE CHARLES A. STEPHENS II, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In August 2005, during a late-night law-enforcement encounter that escalated into an investigatory detention and, ultimately, their arrests, Javier A. Gomez and Niles Emery Woodin were each found to be possessing a handgun. Neither had a license to carry. At the time, the pair were in a pickup driven by Gomez, parked outside a closed Canyon Lake-area restaurant. Subsequently, appellants were each charged with the offense of unlawfully carrying a weapon under

the penal code version in effect at the time of their offense. *See* former Tex. Penal Code Ann. § 46.02(a) (West 2003).[1] Appellants were tried jointly.[2] At trial, neither disputed that he had been carrying a handgun without a license, but relied on the version of the "traveling" exception to penal code section 46.02 in effect at the time of the offense. *See id*. § 46.15(b)(3) (West 2003).[3] As to each appellant, the trial court instructed the jury that "[i]t is not a violation of law for a person to carry a handgun while he is traveling" and that if it found from the evidence, or had a reasonable doubt, that the defendant was "traveling," it must find them not guilty. The jury found both appellants guilty. The court assessed punishment for each at 30 days' imprisonment and a $1,000 fine ($500 of which was probated), but suspended imposition of each sentence and placed both Gomez and Woodin on 12 months' community supervision. The trial court also ordered each appellant to forfeit the weapon he had been convicted of unlawfully carrying.

Gomez and Woodin filed a joint appeal. In five issues, they assert that the trial court erred in failing to suppress evidence of the handguns as fruits of an unlawful search, abused its discretion in failing to exclude from evidence certain portions of the patrol-car videotape of the

---

[1] The applicable penal code provisions have since been amended by the legislature. Because those amendments apply prospectively, we cite throughout to the versions in effect at the time of the offense.

[2] Appellants, who were represented by the same counsel, moved for the joint trial.

[3] I.e., neither the statutory presumption of traveling, effective on September 1, 2005, nor the 2007 amendments regarding the carrying of handguns in vehicles apply in this case. *See* Act of May 27, 2005, 79th Leg., R.S., ch. 288, § 1, 2005 Tex. Gen. Laws 866, 866-67 (regarding traveling presumption), *repealed by* Act of May 23, 2007, 80th Leg., R.S., ch. 693, § 3(2), 2007 Tex. Gen. Laws 1318, 1319; Act of May 23, 2007, 80th Leg., R.S., ch. 693, § 1, 2007 Tex. Gen. Laws 1318, 1318 (regarding handguns in motor vehicles) (current version at Tex. Penal Code Ann. § 46.02(a)(2) (West Supp. 2007)).

2

episode, challenge the legal and factual sufficiency of the evidence supporting their convictions, and contend that the trial court's order of forfeiture was "without any authority in law." We will affirm the judgments.

## BACKGROUND

The jury heard evidence that, at approximately 2:54 a.m. on August 2, 2005, Deputy Hiram Munoz of the Comal County Sheriff's Office was patrolling the area around Canyon Lake along F.M. 306 when he observed a gray Ford pickup truck parked near a restaurant, the Casa del Lago.[4] Munoz, who testified that he had several years' experience as a law-enforcement officer in the area, testified that "[t]he business was closed at the time and there was no reason why the vehicle should be there." He decided to investigate "why anybody was there at that time of night," and pulled his patrol car behind the parked pickup. Munoz approached the vehicle and observed two males inside. Munoz testified that he "asked them what they were doing and the driver responded something to the effect that he had to urinate. That he had stopped to go to the bathroom or something along those lines and something about being lost or something."

Munoz noticed that when he talked to the men "they were both pretty nervous." After checking identification, Munoz asked the driver, now identified as Gomez, a Bexar County resident, to step out of the vehicle. Munoz testified that during the course of his conversation with Gomez, Gomez admitted that he had earlier "lied" to Munoz and that the actual reason they were parked

---

[4] There was a factual dispute during trial as to precisely how close to the restaurant the pickup was parked. Deputy Munoz testified that the truck was parked "a couple feet from the restaurant." Woodin later testified that they were closer to F.M. 306. It is undisputed, however, that the pickup was located within the restaurant's parking lot.

at the restaurant was "because they were looking for some girl who needed help." According to Munoz, Gomez told him that the girl was likely "involved in illegal activity" or "possibly high on drugs or something." Munoz asked Gomez about the woman's location. Gomez replied that she was "somewhere on Cranes Mill Road" but that "he wasn't sure where she was at and she had called him on the phone and that he was having trouble communicating with her or getting a hold of her again." Munoz thought it suspicious that the men would have traveled all the way from Bexar County at that hour ostensibly to pick up a friend without a clear idea where she was, adding that Cranes Mill Road "breaks up in a whole lot of different sections. . . . so there's a large area of Cranes Mill Road that's kind of a vague description."

The State asked Munoz if he was concerned for his safety at the time. He responded,

Yes. I was by myself. The story—just based on the way I was talking to them and the way he was talking to me I could tell he was nervous and something wasn't right. I think I went and talked to Mr. Woodin next and he said basically that he was looking for some girl and he didn't know her name. He didn't know where she was at. And all he said was basically she was in some kind of trouble. At that point I felt uneasy about the situation. The time of night I wasn't sure where other deputies were at, so I called for a cover unit to come back me up.

After other deputies arrived, Deputy Munoz testified that he asked Woodin to step out of the vehicle. Munoz then looked inside the truck and noticed a black duffel bag near the front seat. Munoz testified that when he asked Woodin what was in the bag, Woodin "began to get really nervous." According to Munoz, Woodin told him that the bag contained "just a change of clothes" in case they met "some girls or something like that."

4

Deputy Munoz then asked Gomez if he had any weapons. Munoz testified that Gomez told him he had a knife. Munoz asked Gomez how large the knife was, and Gomez told him, "It's pretty large." Munoz testified that Gomez "pulled out a lock-blade" and Munoz took the knife from him "to secure for officer safety." Munoz further testified, "I then asked him if there were any other weapons in the vehicle. He said, 'Yeah, there's another knife on the driver's side.' So he led me to that." Munoz testified that Gomez began walking toward the driver's side door as if to retrieve the knife. Munoz told Gomez to remain where he was, and Munoz opened the vehicle door and retrieved the other knife. Munoz explained, "I wanted to make sure there [weren't] any other weapons and . . . if there [were] weapons I wanted to secure them for my safety and for my other fellow deputies' safety. I walked over to get the knife that was in the driver's side near the door and it was another pretty large knife." Munoz added that both knives appeared "larger than five-and-a-half inches," and he suspected they were illegal. *See* Tex. Penal Code Ann. § 46.01(6)(A) (West 2003).

When he retrieved the knife, Munoz noticed that there was a box of .454 handgun ammunition near the driver's side door. Munoz asked Gomez about the ammunition and where the gun was. Gomez replied that it "should be" at home, then said it was at home. Munoz then asked specifically if there was a gun in the vehicle; Gomez responded that it "might" be. Munoz replied that the answer was either "yes" or "no," to which Gomez replied, "I don't think it is." Munoz then asked whether Gomez would have a problem with him searching the vehicle, whereupon Gomez admitted, "It's in there, buddy." Munoz retrieved a loaded .454 chrome Casull handgun from the center console. Gomez admitted that the gun belonged to him.

5

Upon discovering and securing the handgun, Munoz instructed the other deputies to place Gomez and Woodin in handcuffs "for officer safety reasons." The deputies then continued to search the truck. In the black duffel bag, contrary to Woodin's initial description of its contents, was found two ski masks (one colored orange and the other camouflage), a pair of gloves, and a set of plastic zip ties. Zip ties, Munoz testified, could be used (and sometimes were used by law enforcement) as restraints similar to handcuffs. Another handgun was found in the center console of the truck—a loaded, black, .32 automatic Beretta. Woodin admitted that this gun belonged to him. The deputies also found a large machete in the tool box of the truck. At the scene, Woodin sought to explain the presence of the guns and other materials by claiming that he and Gomez used them when hunting wild hogs.

At the end of Deputy Munoz's direct examination, a redacted version of the patrol-car videotape of the episode was admitted into evidence and played for the jury. The videotape begins when Munoz was running a background check on Gomez and Woodin from his vehicle, minutes before Munoz approached the truck a second time and asked Gomez to exit the vehicle.[5] The videotape was largely consistent with Munoz's testimony.

Following Deputy Munoz's testimony, the State rested its case. Appellants' first witness was Azure Mendez, who was represented to be the woman whom the men were trying to locate on the night of their arrest. Mendez testified that, on the night in question, she was with her

---

[5] Deputy Munoz explained, "Our video cameras automatically come on when we hit our lights or you have got to do it manually. I initially approached [Gomez] and the camera was off. I probably forgot to turn it on. When I went back the second time and talked to him that's when I turned the camera on. I guess that was from the car. So on videotape I had actually made contact with him a couple minutes before the videotape was on."

boyfriend at a party at a remote location somewhere along or near Cranes Mill Road. Between 12:45 a.m. and 1:30 a.m., she called Gomez "in distress." Mendez explained that a fight had occurred at the party and that she and her boyfriend, whom Mendez testified was "highly intoxicated," had decided to leave. Because they had rode to the party with a person who did not want to leave the party, Mendez explained that she and her boyfriend left on foot. After walking for approximately 45 minutes, Mendez became scared, started crying, and decided to call Gomez because he was the only person she knew who would come and get her. Upon calling him, Mendez informed Gomez that she was walking along what she believed to be "Canes Mill Road [sic]," but she was unable to give him any other details because she did not know exactly where she was. Mendez testified that she told Gomez to "bring protection." When asked to explain why she told Gomez to "bring protection," Mendez testified, "I was scared. I was nervous. I felt like I was in danger." On cross-examination, Mendez insisted, however, that she "didn't tell him to bring a gun."

Both Gomez and Woodin testified. Woodin, who resided in Bexar County (as did Gomez), testified that Gomez called him on the night in question sometime after midnight and told him that he had a friend who was in trouble and needed some help. Woodin explained that Gomez was a longtime, close friend and added that Gomez is "not real physical. He's had a stroke, so I went with him to make sure everything was okay." Woodin added that he and his wife had been arguing and that the situation "presented the perfect opportunity to get out of the house."

Woodin testified that he and Gomez frequently hunted hogs on properties to which Woodin had access, often going "on a whim." Thus, Woodin claimed, the men kept hunting equipment in their vehicles. Woodin testified that his handgun was used when they trap the

7

hogs because hogs "can be mean if they are cornered." The knives, gloves, and zip ties, Woodin explained, were used when field-dressing the hogs (the zip ties, he maintained, were used to tie up the hogs' feet). He added that the orange ski mask was sometimes used by his son for safety reasons, identifying him as a hunter, and the camouflage mask was used "to bait the hogs in to come in close."

Woodin testified that, on the night in question, he and Gomez drove "straight up" from Woodin's house in San Antonio "from FM 78 to 1604 to 35 . . . cross Bexar County line, across Guadalupe County line into Comal County and got off at FM 306 off 35." Woodin testified that he did not know where Cranes Mill Road was located and that he and Gomez got lost. When asked how they ended up in front of the restaurant, Woodin testified that Gomez took medication for his stroke that caused him to frequently urinate. According to Woodin, they had stopped for that purpose.

Finally, Gomez testified. Gomez recounted how when Mendez called him she was "stressed out, crying, freaked out," and that "she sounded out of it. Maybe drunk." Gomez was concerned about her. When asked why he requested that Woodin come with him, Gomez testified that because of his stroke, he was not as "agile or mobile" as he used to be, and he wanted someone with him in case he got into an altercation.

Gomez was also asked about the route they took to get to Cranes Mill Road from Woodin's house. Gomez explained,

> We left his house and took 78. 78 to 1604. 1604 to 35 North. 35 North to the 306 exit. Left on 306 and found a part of Cranes Mill Road and drove up and down it. It wasn't it. We're going down 306 past the Casa Del Lago restaurant when I

8

remembered there was another . . . part of Cranes Mill Road on the, I guess it's on the south side of the lake, which is Sattler. So I turned around and as I was turning around I figured it would be a good time to urinate.

Gomez testified that while they were pulled over, he attempted unsuccessfully to reach Mendez on his cell phone. According to Gomez, it was at this point that Deputy Munoz arrived. When asked if Munoz's testimony about their initial encounter was true, Gomez testified, "Not exactly." He explained,

Well, the way it occurred is he asked, "What are you doing here?" I said, "Using a cell phone," which was true. "Why are you pulled over on the side of the road?"

The whole reason I said I was lying to him because he asked me again, you know, "What are you doing on the side of the road? Why are you so nervous?" I said, "Well, I lied to you. I actually pulled over to urinate." And you know, I didn't want to admit to that. Of course I was nervous. I know it's an offense of some sort. I don't know what it is, but it's definitely an offense. So I told him, "Yes, I lied to you. I told you I was using the phone, but truthfully I had stopped to urinate." And in the video it makes me sound like I had been lying to him the whole time, but that was the only lie.

On cross-examination, Gomez admitted that he brought his gun with him because he anticipated a possible altercation. He added, however, that although he had a gun with him, Woodin "was [his] first defense." Gomez testified that he knew that Cranes Mill Road was a long road with portions that were "split up," but he "figured [he] would get out there and . . . be able to reach [Mendez] again. Get a landmark. . . ." He added, "I didn't need an address. I just needed to identify a place on Cranes Mill Road. Even if it's split up three times, say it's ten miles each, it's not going to take me that long to go ten miles up that road and ten miles down that road, ten miles down the other road. I would still find her if she were to do what she said, 'I'm going to walk into this road.'"

9

As to each defendant, the trial court instructed the jury regarding the "traveling" defense as it existed at the time of the offense:

> It is not a violation of law for a person to carry a handgun while he is traveling. Therefore, if you find from the evidence beyond a reasonable doubt, that on the occasion referred to in the information, the defendant was carrying on or about his person a handgun, as alleged, but you further find from the evidence, or you have reasonable doubts thereof, that at the time of the occasion referred to in the information [defendant] was traveling, you will find the defendant not guilty.

As noted, the jury convicted both Gomez and Woodin of the offense of unlawfully carrying a weapon. Punishment was assessed at 30 days' imprisonment and a $1,000 fine, but imposition of the sentence was suspended and they were placed on community supervision for 12 months. As a condition of community supervision, the trial court ordered Gomez and Woodin to forfeit their handguns. The court did not enter findings of fact and conclusions of law to elaborate on its basis for this ruling, nor were any requested. This appeal followed.

## DISCUSSION

**Evidentiary rulings**

Appellants did not file a pretrial written motion to suppress, but, on the first day of trial, during a recess following the State's opening, the trial court held a hearing out of the presence of the jury in which it ruled on several objections by appellants to audio portions of the patrol-car videotape. In this context, appellants urged that any evidence obtained after Deputy Munoz opened Gomez's pickup door should be suppressed as an illegal warrantless search without consent. The only evidence offered during this hearing was the videotape itself. The State agreed

to exclude some objectionable portions of the videotape.[6] As for those portions in dispute, the trial court sustained some objections but overruled others, including appellants' complaints regarding the fruits of the search.

### *The search*

In their fourth issue, appellants complain that the trial court erred in overruling its motion to suppress evidence obtained during the warrantless search of the pickup. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We give trial courts almost complete deference in determining historical facts, but we review de novo the trial court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). In reviewing a trial court's ruling on a motion to suppress, we review the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court does not make explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports these implied findings. *Id.* "Generally, implied findings would be limited to the record produced at the suppression hearing." *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007). "However, when the parties subsequently re-litigate the suppression issue at the trial on the merits, we consider

---

[6] Lacking time to edit the videotape, it was agreed that the audio to the excluded portions would simply be turned down or off.

all evidence, from both the pre-trial hearing and the trial, in our review of the trial court's determination."[7] *Id*. We "uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case." *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002).

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV; *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Id*. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *See* Tex. Code Crim. Proc. Ann. arts. 18.01, 18.04 (West Supp. 2007) (providing requirements for issuance of a search warrant); *Amador*, 221 S.W.3d at 673; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford*, 158 S.W.3d at 492. Reasonableness is measured by examining the totality of the circumstances. *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004). A search conducted without a warrant is per se

---

[7] In this case, the record reflects that the motion to suppress was re-litigated during trial. Both the State and defense counsel asked Deputy Munoz questions about his conduct and beliefs during the search, and it is apparent from these questions and Munoz's answers to the questions that the admissibility of the evidence seized during the search remained an issue during trial. Therefore, in our review of the motion to suppress, we shall consider both the videotape and the relevant testimony of Deputy Munoz. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996) ("Where the State raises the [suppression] issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review.").

unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant requirement. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003).

One such exception was recognized in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . . ," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming or dispelling his suspicions. 392 U.S. at 30. Furthermore, "when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." *Id*. at 24. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "Rather, a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry*, 392 U.S. at 26). "If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Sibron v. New York*, 392 U.S. 40, 65-66 (1968).

Such protective searches are not limited to a suspect's person. Because "roadside encounters between police and suspects are especially hazardous," officers may also perform a protective search of "the passenger compartment of an automobile, limited to those areas in which

13

a weapon may be placed or hidden." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Such a search is permissible "if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id*. "'[The] issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id*. at 1050 (quoting *Terry*, 392 U.S. at 27).

Appellants do not complain of Munoz's initial encounter with them or his initial investigative detention to ascertain what they were doing. *See Cronin v. State*, No. 03-04-00266-CR, 2005 Tex. App. LEXIS 10450, at *15-16 (Tex. App.—Austin Dec. 16, 2005, no pet.) (op. on reh'g) (mem. op., not designated for publication) (finding reasonable suspicion supported investigatory stop of motorist seen emerging from behind Canyon Lake-area restaurant at a similar hour of the morning).[8] Their Fourth Amendment complaint centers on Munoz's opening the pickup's driver's-side door and the events that followed. By this time, there was evidence (1) Munoz had spotted the pickup at a suspicious location at a suspicious time; (2) Munoz had noticed that Gomez and Woodin "were both pretty nervous"; (3) Gomez had been less than forthcoming about what

---

[8] In fact, during his opening statement, appellants' counsel spoke approvingly of Munoz's initial actions:

> [Munoz] confronts these two men he views as suspicious. For the reason, ostensibly, that they are at this restaurant that's closed and that's when burglaries happen. And that's fine and dandy. We like that. I like that. I like to see police proactive in situations like that. That's how burglaries get stopped.

14

the men were doing there, and even admitted initially "lying"; (4) Gomez told Munoz, as reflected on the patrol-car videotape, that Mendez was involved in illegal activity and was "high out of her mind"[9]; (5) Gomez could not specify where Mendez was; and (6) Gomez was found to be carrying a large knife that Munoz suspected was over five and one-half inches long, *see* Tex. Penal Code Ann. § 46.01(6)(A) (prohibiting carrying of knives longer than five and one-half inches); *see also Glazner v. State*, 175 S.W.3d 262, 265 (Tex. Crim. App. 2005) (holding that possession of knife justifies *Terry* search).[10]

At this juncture, Munoz testified, "I then asked him if there were any other weapons in the vehicle. He said, 'Yeah, there's another knife on the driver's side.' So he led me to that." The videotape shows Gomez beginning to walk toward the driver's side door to retrieve the knife. However, Munoz stops Gomez and tells him to remain where he is. Munoz then retrieves the other knife. Munoz explained the reason for his actions: "I wanted to make sure there [weren't] any other weapons and . . . if there [were] weapons I wanted to secure them for my safety and for my other fellow deputies' safety. I walked over to get the knife that was in the driver's side near the door and it was another pretty large knife."

The foregoing evidence supports implied findings by the trial court that throughout the episode, Gomez and Woodin provided Deputy Munoz with an increasing number of reasonable

[9] On the videotape, Munoz then asks if Mendez is "on meth," to which Gomez replies, "Probably."

[10] Munoz did not frisk Gomez for the knife, however, because, according to Munoz, Gomez pulled it out of his pocket. Gomez and Woodin contend that the fact that Deputy Munoz stood "within just two or three feet" of Gomez without frisking him is evidence that Munoz was not concerned for his safety. However, Munoz testified this was simply an "error" on his part and that he "shouldn't have been that close."

bases for concern for his safety and suspicion that Gomez and Woodin were, or were about to be, engaged in criminal activity. Again, "'[The] issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Long*, 463 U.S. at 1050 (quoting *Terry*, 392 U.S. at 27). Under the above circumstances, we hold that Munoz "possesse[d] a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing that the suspect [was] dangerous and the suspect may gain immediate control of weapons." *Id*. Munoz's reasonable belief justified the initial search of the driver's side of the vehicle.

As for the subsequent search of the vehicle after Gomez and Woodin were handcuffed, "[o]nce an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment." *Thornton v. United States*, 541 U.S. 615, 623 (2004); *Glazner*, 175 S.W.3d at 266. The record supports an implied finding by the trial court that the deputies searched the entire passenger compartment of the truck only after they had probable cause to arrest Gomez. Deputy Munoz testified that once he found the handgun in the vehicle, he "had an offense" for which he could arrest Gomez—the unlawful carrying of a handgun. The videotape shows that the deputies did not perform a search of the entire passenger compartment until after Munoz found the first handgun in the truck's center console and determined that Gomez did not have a permit to carry it. Therefore, the subsequent search of the truck which yielded the second unlawfully-carried handgun was also lawful. We conclude that the trial court did not err in overruling appellants' motion to suppress. We overrule their fourth issue.

16

### The patrol-car videotape

We next address appellants' fifth issue, in which they assert that the trial court abused its discretion in failing to exclude certain other audio portions of the patrol-car videotape. When reviewing a decision to admit or exclude evidence, an appellate court must determine whether the trial court's decision was an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). Unless the trial court's decision was outside the zone of reasonable disagreement, an appellate court should uphold the ruling. *Id*.; *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990). Furthermore, error in the admission of evidence is subject to a harm analysis. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). A violation of the evidentiary rules that results in the erroneous admission of evidence is non-constitutional error. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Any non-constitutional error "that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

At the conclusion of the hearing regarding appellants' objections to the videotape, as noted, the trial court informed the parties which segments of the tape would not be heard by the jury and made the State responsible for turning the audio on and off at the appropriate times specified in its ruling. During Munoz's testimony, the State moved that the videotape be admitted into evidence. Appellants' counsel stated that "with reference to the objections I previously made and that were ruled upon I have no further objection." The trial court reaffirmed its previous rulings and admitted

17

the videotape "with those redactions as ordered by the Court previously." The record reflects that the tape was played for the jury without objections by either side.

On appeal, appellants re-urge the objections that the trial court had overruled. First, they complain about the admission of a portion of the patrol-car videotape that had recorded a radio conversation between Deputy Munoz and a dispatcher. Appellants objected to the exchange on the basis of hearsay and relevance. Hearsay is a statement offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). The record reflects that the substance of the conversation was not an issue during trial, and the conversation itself was not offered for any particular purpose other than to establish that Munoz was conducting an investigation into the suspects' backgrounds. It was not outside the zone of reasonable disagreement for the trial court to conclude that the conversation with the dispatcher was not hearsay. As for relevance, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. An issue during trial was the course and conduct of Munoz's investigation of Gomez and Woodin. It was not outside the zone of reasonable disagreement for the trial court to conclude that Munoz's conversation with the dispatcher was relevant to that issue.

Next, appellants assert that a portion of the tape containing Gomez's answers to Deputy Munoz's questions about Mendez and her alleged drug use were speculative, irrelevant, and more prejudicial than probative. We find no abuse of discretion in the admission of this evidence. It was not outside the zone of reasonable disagreement for the trial court to conclude that Gomez, who was friends with Mendez and had earlier been in communication with her, would have personal

18

knowledge of the specific reason why Mendez needed his help.  It was also not outside the zone of reasonable disagreement for the trial court to conclude that the statements were relevant to appellants' "traveling" defense.  As for any potential prejudice, relevant evidence may be excluded only "if its probative value is substantially outweighed by the danger of unfair prejudice."  Tex. R. Evid. 403.  We note that the statements concerned Mendez's alleged drug use, and not any drug use by either of the defendants.  We conclude that the trial court did not act outside the zone of reasonable disagreement in finding that the probative value of the statements was not substantially outweighed by the danger of unfair prejudice.

Third, appellants complain about a recorded question by Deputy Munoz to Gomez, "Have you ever been arrested before?"  The record reflects that the parties agreed to omit Gomez's response to the question, in which he remembers a public intoxication arrest from 1993.  The trial court asked the parties when on the tape this response occurred.  The State informed the trial court, without objection from defense counsel, that the response was from 2:59:06 to 2:59:12.  The trial court ruled that this portion of the audio would be omitted.  However, the question was actually asked at 2:58:59.  At 2:59:02, Gomez initially answered, "No, never."  Thus, the jury apparently heard both the question and Gomez's denial.  Assuming that this was a mistake that violated the parties' agreement (the record is unclear as to whether the parties agreed to omit the entire exchange), appellants did not object to it, either when the trial court was informing the parties which portions of the audio it would omit or when the tape was played.  Therefore, they failed to preserve any error.  Furthermore, even if error had been preserved, the error did not affect appellants' substantial rights.  The portion of the videotape in which Gomez informs Munoz of his prior

19

arrest was omitted by the trial court and was not heard by the jury. Accordingly, there has been no showing of harm.

Fourth, appellants complain about portions of the tape containing statements by Deputy Munoz in which he discusses with another officer the items that where found in the duffel bag and opines, "Something ain't right here," and, "Not sure what I got here." Appellants objected to these statements as hearsay, irrelevant, and unfairly prejudicial. Even assuming the validity of appellants' objections, they have failed to show how the admission of these statements affected their substantial rights. The statements about what was found in the duffel bag (zip ties, gloves, and ski masks) referred to evidence that had already been admitted through Munoz's testimony, and the other statements merely reflect Munoz's suspicions at the scene and his concern about the situation after discovering the weapons and the other items in the vehicle. Munoz had already testified to these concerns prior to the playing of the videotape. Therefore, the statements in the videotape were merely cumulative of other properly admitted evidence and were harmless. *See Matz v. State*, 21 S.W.3d 911, 912-13 (Tex. App.—Fort Worth 2000, pet. ref'd).

Fifth, appellants complain about the admission of a portion of the tape containing Deputy Munoz's question, "Y'all planning on kidnapping somebody?" They claim that this question should have been excluded as irrelevant and unfairly prejudicial. The record reflects that the trial court informed the parties that it was going to exclude this question beginning at 3:07:40. However, the question was actually asked at 3:07:38. The effect of this discrepancy was that while the jury did not hear Gomez's response, it apparently heard the question. As with the question about Gomez's prior arrest, appellants did not preserve error regarding this complaint.

20

Sixth, appellants contend that Deputy Munoz's questioning of Woodin beginning at 3:13:09 "constituted inadmissible custodial interrogation because Woodin was not Mirandized until 3:30:37, some 17 minutes" after Munoz began questioning him. However, the record reflects that the trial court did exclude significant portions of the audio during this time period, from 3:13:45 to 3:16:11 (when Munoz was questioning Woodin about the items in the duffel bag), 3:17:59 to 3:18:10 (when Munoz told another officer, "They were fixing to rob somebody."), 3:21:35 to 3:23:23 (when Munoz accuses Gomez and Woodin of lying to him and tells them that he thinks they are planning on either robbing or killing somebody), and 3:27:55 to 3:28:15 (when Munoz informs another officer over his radio that whatever Gomez and Woodin were planning to do, "it was nothing nice, that's for sure."). The remainder of the audio during this time period consists of evidence and statements that were solicited during the testimony of Munoz, Gomez, and Woodin without objection. Therefore, even were we to assume that this portion of the tape should have been excluded in its entirety, "the improper admission of evidence is not reversible error when substantially the same facts are proven by unobjected-to testimony." *Hitt v. State*, 53 S.W.3d 697, 708 (Tex. App.—Austin 2001, pet. ref'd).

Finally, appellants assert, without elaboration, that the above "errors in their cumulative effect" denied them a fair trial. As we have discussed, each of appellants' complaints about the statements in the tape involved either no error, harmless error, or were not preserved. On this record, appellants have failed to make a showing of cumulative error. *See Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002); *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. 1999).

21

We overrule appellants' fifth issue.

**Evidentiary sufficiency**

Appellants' second and third issues challenge the legal and factual sufficiency of the evidence supporting their convictions. They do not dispute that they were carrying handguns without a license. Instead, they assert that the evidence was insufficient to disprove, beyond a reasonable doubt, that they were "traveling." A person commits an offense under penal code section 46.02 if he "intentionally, knowingly, or recklessly carries on or about his person a handgun . . . ." Tex. Penal Code Ann. § 46.02(a). However, section 46.02 does not apply to a person who is "traveling." *Id*. § 46.15(b)(3). The traveling exclusion from article 46.02 has the procedural and evidentiary consequences of a defense. *Illingworth v. State*, 156 S.W.3d 662, 664 (Tex. App.—Fort Worth 2005, no pet.) (citing Tex. Penal Code Ann. § 2.03(e) (West 2003)). Consequently, once the defendant produces some evidence that supports the defense, the State bears the burden of persuasion to disprove the raised defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). However, "[t]he burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory." *Id*. In other words, the State has "no duty to introduce affirmative controverting evidence to rebut the defensive theory." *Ayesh v. State*, 734 S.W.2d 106, 107 (Tex. App.—Austin 1987, no pet.). Rather, the State satisfies its burden of proof if "the jury could properly disbelieve appellant's testimony" on the issue. *See id*. (citing *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. 1978)).

22

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Rollerson v. State*, 227 S.W.3d 718, 724 (Tex. Crim. App. 2007); *Shams v. State*, 195 S.W.3d 346, 347 (Tex. App.—Austin 2006, pet. ref'd) (citing *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981)). It is not necessary that every fact point directly and independently to the defendant's guilt, but it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We must consider all the evidence, rightly or wrongly admitted, that the trier of fact was permitted to consider. *See Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001).

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id.* at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* at 417.

23

Though it has been a statutory defense to the unlawful-carry offense since the 1870s, the legislature has never defined what "traveling" means, and its precise meaning has been the subject of much debate. *See Ayesh*, 734 S.W.2d at 108. The court of criminal appeals has instructed us that we do not apply the ordinary or plain meaning of "traveling" as simply going from place to place, as "almost every person who goes from place to place may be considered a traveler." *Bain v. State*, 44 S.W. 518, 518 (Tex. Crim. App. 1898). Instead, Texas courts have generally distinguished "traveling" based on the distance and duration of the trip, also considering the mode of transportation, although there are no bright-line tests and the parameters that have evolved from case-specific application are not models of clarity. *See Birch v. State*, 948 S.W.2d 880, 882 (Tex. App.—San Antonio 1997, no pet.). In fact, the cases have been described as being in "hopeless confusion," *id.*, a problem only compounded by the difficulty of extracting principles from older cases involving more primitive modes of transportation to guide cases involving automobiles and superhighways.

Some cases have suggested that crossing county lines establishes traveling, *see Illingworth*, 156 S.W.3d at 665 (citing *State v. Ballard*, 167 S.W. 340, 340 (Tex. Crim. App. 1914)), but this is not a categorical rule, *see Perez v. State*, 87 S.W.3d 648, 652-53 (Tex. App.—San Antonio 2002, no pet.), and if the trip between counties is "so short there is no real journey," then one is not a traveler. *Sanchez v. State*, 122 S.W.3d 347, 356 (Tex. App.—Texarkana 2003, pet. ref'd) (driving fifteen minutes between cities in different counties did not constitute traveling). This Court has previously observed that the traveling exception generally "applies to persons on a journey which takes them some distance from their home in excess of 35 miles, or 40 miles, and the trip must

24

typically be overnight." *Ayesh*, 734 S.W.2d at 108 (citing *Wortham v. State*, 252 S.W. 1063, 1064 (Tex. Crim. App. 1921), *George v. State*, 234 S.W. 87, 89 (Tex. Crim. App. 1923) & *Vogt v. State*, 258 S.W.2d 795, 796 (Tex. Crim. App. 1953)).

A person can lose his status as a traveler during the journey. Mere delay does not deprive one of the defense of traveling, but when one turns aside from his journey to partake of any pleasure or business not connected with the journey, he may lose his traveler status. *Birch*, 948 S.W.2d at 883. For example, if a traveler loiters along the way, or unnecessarily deviates from the course of travel, he loses his status as a traveler. *Payne v. State*, 494 S.W.2d 898, 899-900 (Tex. Crim. App. 1973) (holding that evidence defendant stopped in lounge for two hours en route from Tyler to Dallas, allegedly to await return call from building contractor he was to meet in Dallas, defeated traveling defense as a matter of law). However, interruption of the journey for legitimate incidental purposes does not forfeit a traveler's right to carry a pistol. *Kemp v. State*, 31 S.W.2d 652, 653 (Tex. Crim. App. 1930) (holding that twenty-minute stop for meal at restaurant did not constitute deflection from defendant's journey that would forfeit traveler exemption).

Further, the court of criminal appeals has instructed us that under the statutory travel exception, properly construed, "[s]o long as [the defendant] is a traveler within the meaning of the law and is pursuing his journey, an inquiry as to his intent in carrying the pistol is not pertinent." *Grant v. State*, 13 S.W.2d 889, 890 (Tex. Crim. App. 1929); *see United States v. Prieto-Tejas*, 779 F.2d 1098, 1104 (5th Cir. 1986); *Evers v. State*, 576 S.W.2d 46, 50 (Tex. Crim. App. 1978); *cf. Moosani v. State*, 914 S.W.2d 569, 570 (Tex. Crim. App. 1995) (Baird, J., dissenting) (describing *common-law* exceptions to article 46.02 under which defendant must show that his purpose in

carrying was not unlawful). On the other hand, "[t]he defense of travel is a question of fact," *Evers*, 576 S.W.2d at 50, and "[c]learly, the fact finder is not required to believe the appellant's reason for carrying the pistol," i.e., that he was, in fact, traveling. *Id.*

In this case, Gomez and Woodin each testified that they drove from Bexar County bound for a location in northern Comal County somewhere along Cranes Mill Road, where they anticipated finding Azure Mendez. Azure Mendez corroborated their testimony when she testified that she called Gomez and requested him to drive up from San Antonio and find her. Appellants generally described the route they drove as beginning in the eastern San Antonio metropolitan area near the intersection of F.M. 78 and 1604, along 1604 (the city's "outer loop"), to IH-35, northeasterly through a short stretch of Guadalupe County into Comal County, then westerly along F.M. 306, where they found a portion of Crane's Mill Road. After driving up and down this section of Crane's Mill Road and failing to find Mendez, Gomez testified, the pair went back to 306 and ultimately pulled into the Casa del Lago parking lot. Although they did not specify the exact mileage they had driven by the time Deputy Munoz encountered them in the Casa del Lago restaurant parking lot, the direct distance between that location and the vicinity of 78 and 1604 along the route they described was approximately 35-40 miles. Moreover, because the intersection of 306 with Crane's Mill Road is approximately 10 miles west of that location, appellants' depiction of their route would indicate that they had driven at least an additional 20-25 miles.

Although the distance of appellants' trip is in the range that Texas courts have held to characterize traveling, *see Ayesh*, 734 S.W.2d at 108, it is undisputed that the trip was not intended to be overnight—the men intended to return to Bexar County that night after they located Mendez.

*See id*. Also, based on Mendez's testimony and the evidence of when Deputy Munoz contacted appellants in the Casa del Lago parking lot, the jury could reasonably have concluded that appellants had been driving for less than two hours (and perhaps as little as 90 minutes), including time during which the men claimed they were lost. This evidence was within a range that enabled the jury to conclude that appellants' trip was "so short there was no real journey." *See Sanchez*, 122 S.W.3d at 356.

In any event, the jury could reasonably have rejected appellants' account of their trip. Appellants were found outside a closed restaurant at 2:54 a.m. in possession of guns, knives, ski masks, gloves, and zip ties. Deputy Munoz testified that both Gomez and Woodin behaved nervously when he contacted them and were less than truthful about what they were doing and the weaponry and other items they possessed. As for Mendez's testimony, the State extensively cross-examined her, disputing the credibility of her account by asking her questions about why she did not know where she was, why Gomez thought she was "high" on drugs at the time she called him, and why she had reason to feel threatened at the party if her boyfriend was with her. The jury was "not required to believe" these witnesses' explanations of appellants' activities that evening. *Evers*, 576 S.W.2d at 50; *see Payne*, 494 S.W.2d at 899-900.

We conclude that the above evidence, when viewed in the light most favorable to the verdict, is legally sufficient to disprove appellants' traveling defense. When considering the evidence in a neutral light, we also conclude that the evidence is factually sufficient. Appellants' evidence to support their traveling defense ultimately turns on the credibility of their account and that of Mendez. It is not our role to second-guess the jury's rejection of the apparent conclusion that

27

these witnesses were not credible. We cannot say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict.

We overrule appellants' second and third issues.

**Forfeiture**

Finally, we address appellants' first issue, in which they complain that the trial court had no authority to order forfeiture of their handguns among its conditions of their probation. Appellants urge that forfeiture is an "illegal" condition of probation, and "[b]y casting the forfeiture as a condition of probation, the [c]ourt essentially bypassed" the requirements of art. 18.19 of the code of criminal procedure. Article 18.19 provides that if a person found in possession of a weapon is subsequently convicted or receives deferred adjudication, he is entitled to return of the weapon seized, upon request. Tex. Code Crim. Proc. Ann. art. 18.19(d) (West Supp. 2007).[11] However, the court entering judgment can order the weapon destroyed or forfeited if, after considering the circumstances surrounding the commission of the offense, it determines that possession of the weapon would pose a threat to the community. *Id*. art. 18.19(d)(5).

We need not address the propriety of including forfeiture as a condition of probation, standing alone, because the trial court also ordered forfeiture in its judgment of conviction against each appellant. The trial court did not make explicit findings under article 18.19 that possession of the weapons posed a threat to the community, nor were any requested. Nonetheless, "where no findings of fact or conclusions of law are filed or requested, it is implied that the trial court made

---

[11] Appellants each filed with the trial court a "Motion to Return Seized Weapon."

28

all the necessary findings to support its judgment" and "the judgment of the trial court must be affirmed if it can be upheld on any legal theory that finds support in the evidence." *See Martin v. State*, 873 S.W.2d 457, 458 (Tex. App.—Waco 1994, no pet.) (involving similar judgment of weapon forfeiture). The record here supports the trial court's implied findings that the weapons posed a threat to the community, and those findings empowered the trial court to order forfeiture under article 18.19. The two forfeited handguns—along with two "large" knives, a machete, and a duffel bag containing ski masks and zip ties that Deputy Munoz testified could be used to restrain people—were found in appellants' possession under suspicious circumstances. Gomez testified that appellants were headed, in the middle of the night, to what they anticipated was a possible altercation. Although appellants gave competing explanations of their possession of the guns, the evidence is legally and factually sufficient to support the trial court's implied fact findings that the weapons posed a threat to the community and the court's exercise of its discretion. Accordingly, the trial court did not abuse its discretion in ordering the weapons forfeited. *See* Tex. Code Crim. Proc. Ann. art. 18.19(d)(5). We overrule appellants' first issue.

## CONCLUSION

Having overruled appellants' issues on appeal, we affirm the judgments of the trial court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   April 24, 2008

Do Not Publish